Henry Lilly Lease, Con P. Curran, Jr., S. J. Ewald, and Richard G. Whipple, Trustees under Power of Attorney v. Commissioner.
Lease v. Commissioner
Docket No. 542.
United States Tax Court
1944 Tax Ct. Memo LEXIS 272; 3 T.C.M. (CCH) 404; T.C.M. (RIA) 44137; April 28, 1944
*272 Stanley S. Waite, Esq., 408 Pine St., St. Louis, Mo., for the petitioners. J. E. Marshall, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income, declared value excess profits, and excess profits taxes for the fiscal years ended April 30, 1940, and April 30, 1941, on the ground that petitioners are an association taxable as a corporation. It has been stipulated that if the petitioners do not constitute such an association, there are no deficiencies, but that if they are held to be such an association, the deficiencies are in the following amounts: Fiscal year ended April 30, 1940
Deficiency
Income tax
$ 4,761.47
Declared value excess profits tax
none
Excess profits tax
none
Fiscal year ended April 30, 1941
Income tax
17,416.22
Declared value excess profits tax
1,284.20
Excess profits tax
9,332.15
Findings of Fact The petitioners Con P. Curran, Jr., S. J. Ewald and Richard G. Whipple, are residents of St. Louis County, Mo., and the information returns which were filed on their behalf in connection with the Henry Lilly Lease were filed with the collector of internal revenue at St. Louis. *273 A substantial part of the facts are stipulated and we incorporate herein by reference the stipulation and the attached exhibits. They are essentially set out hereafter in these findings with certain other facts found from the oral evidence offered at the hearing. On April 1, 1937, Henry E. Lilly and Rachel Lilly executed an oil and gas lease on their 118-acre farm in Fayette County, Ill., to Frank H. Schroeder, in consideration of 1/8th of all the oil produced thereunder. On April 5, 1937, the lessee Schroeder assigned 16/11 ths of his interest in the lease to John J. Farrelly in consideration of Farrelly's drilling a well to a depth of 4,000 feet, if necessary, at his own expense. Pursuant to this assignment Farrelly drilled well No. 1 which was completed about March 10, 1938. Between April 6, 1937, and March 18, 1938, Farrelly disposed of all but 16/3 ths of his interest in the lease by assignments of fractional interests to various persons. On March 18, the owners of the fractional interests living in or near St. Louis attended a meeting in St. Louis, called by Farrelly for the purpose of taking action toward the development of the lease. Then, or shortly thereafter, pursuant *274 to a vote taken at this meeting, the owners of a total of 78/112ths interests in the lease separately executed powers of attorney reading as follows: "KNOW ALL MEN BY THESE PRESENTS: That [here appears name of fractional interest owner] of the County of St. Louis in the State of Missouri, has made, constituted and appointed, and by these presents does make, constitute and irrevocably appoint Con P. Curran, Jr., S. J. Ewald, and R. G. Whipple, Trustees, true and lawful attorneys for him and in his name, place, and stead, for a period of six months beginning March 1st, 1938, to sell and deliver his prorata under a certain oil and gas lease [here follows its description] otherwise known as the Henry E. and Rachel E. Lilly farm; to receive the income therefrom and to expend said income in paying his prorata share of the cost of financing, drilling, casing and equipping of wells for the production of oil and gas and other equipment necessary for the storage, delivery and sale of oil or gas, and for premiums for the necessary insurance; to contract in his name or for him as trustees and to obligate him only to the extent of his [here appears fractional interest owned] prorata share; for *275 hiring such labor or other help as is necessary to efficently prosecute the further development of said lease as they may deem advisable and to the extent and for the period that said development, equipment and production of oil or gas from said lease can be accomplished from income derived from oil runs or gas production and sale; and he further agrees that if any contract or contracts which shall have been executed by said trustees prior to the termination of said six-months' period require payment subsequent to the expiration of this power of attorney, he will extend this power to such time as said contract or contracts shall be completed; and he further agrees that in the event of the death or disability of one or more said trustees, this power of attorney shall be extended to whomsoever the majority of the interest holders shall elect and appoint. "It is understood that after the establishment of a fund to be derived out of any or all income, as heretofore mentioned, sufficient to pay for the things and obligations mentioned above that the surplus of the income derived from the [here appears fractional interest owned] prorata share shall be paid to the grantor herein. "If all *276 of the above work, labor and materials shall have been fully performed and paid for by the expiration of this power of attorney, then the whole of such income derived from said [here appears fractional interest owned] prorata share, if any shall be paid to the grantor, giving and granting to his said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully, to all intents and purposes, as he might or could do if personally present at the doing thereof; hereby ratifying and confirming all that his said attorneys or their substitute, may or shall lawfully do, or cause to be done by virtue hereof. "IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 18th day of March, 1938." Before June 1, 1938, Farrelly assigned his remaining 3/16ths interest, and Schroeder disposed of all but 13/112ths of his remaining interest in the lease; on June 6, 1938, fractional interests were held by some 37 owners in proportions ranging from 1/224 to 25/112. They included not only those signing the powers of attorney set out herein, but also J. B. Whisenant and John Trenchard, and Lewis Production *277 Co., the latter owning a 25/112th interest. Since the original "Power of Attorney" was to be effective for only six months, on or about June 6, 1938, all of the owners of fractional interest, except Whisenant and Trenchard and Lewis Production Co., executed the following instrument: "POWER OF ATTORNEY "KNOW ALL MEN BY THESE PRESENTS, That the undersigned of the City and County of St. Louis in the State of Missouri, have made, constituted and appointed, and by these presents do make, constitute and irrevocably appoint Con P. Curran, Jr., S. J. Ewald and R. G. Whipple, Trustees, true and lawful attorneys for them and in their name, place, and stead to enter into any contract or contracts for the development and/or operation of a certain oil and gas lease [here follows its description] otherwise known as the Henry E. and Rachel E. Lilly farm; whether payments under said contract or contracts shall be made in cash or out of oil produced from said leasehold premises (including the proceeds thereof), or both, and to pledge, assign and/or transfer to any such contractor or contractors all of my right, title and interest in and to seven-eighths (7/8) of the oil as and when produced, saved *278 and sold from said leasehold premises, together with the right to produce and sell said oil, and to collect the proceeds thereof, until any such contractor or contractors have been reimbursed from the proceeds of said oil for all sums to become due under the terms of any such contract or contracts, and to execute any transfer orders or other instruments required by any pipe line company or oil purchasing company running said oil. "The undersigned further agree that in the event of the death or disability of one or more of said trustees, this power of attorney shall be extended to whomsoever the majority of the interest holders shall elect and appoint. "It is understood that after the contractor or contractors have been reimbursed under any contract or contracts as heretofore mentioned, the surplus of the income derived from our prorata share shall be paid to the undersigned as their interests may appear, giving and granting to their said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully, to all intents and purposes, as he or they might or could do if personally present *279 at the doing thereof; hereby ratifying and confirming all that his or their said attorneys or their substitute, may or shall lawfully do, or cause to be done by virtue hereof. "IN TESTIMONY WHEREOF, I have hereunto set our hands and seals this 6th day of June, 1938." On June 28, 1938, Curran, Ewald and Whipple entered into a written agreement as "Trustees under a certain power of attorney" with J. B. Whisenant and John Trenchard, oil well drilling contractors, doing business as Whisenant and Trenchard, a partnership, as independent contractors, providing for the drilling of six wells on the leased premises, and six producing wells were completed by October 15, 1938. Whisenant and Trenchard also own fractional interests in the lease. This drilling contract provided, inter alia, for the assignment by petitioners to Whisenant and Trenchard, of 7/8 of the oil produced thereunder, with right of re-assignment, until the contractors were reimbursed for all sums to be due them under the contract; and also provided that the liability of petitioners who were described in the contract occasionally as "owners" should be limited to their shares of the oil runs. On or about June 15, 1938, *280 in an attempt to increase the flow of well No. 1, the casing was broken and the well ruined and thereafter abandoned. A supplemental agreement dated November 28, 1938, was entered into by and between Curran, Ewald and Whipple, and Whisenant and Trenchard for the drilling of a replacement well. On July 25, 1938, George Parker and Charles L. McCune, on behalf of the Lewis Production Co., in which name certain fractional interests were held, executed an instrument captioned "Power of Attorney," which confirmed and approved the contract executed by Curran, Ewald and Whipple on behalf of the owners of the fractional interests in the lease, and Whisenant and Trenchard. This was necessary since Parker and McCune had not signed the power of attorney dated June 6, 1938. On May 8, 1939, Curran, Ewald and Whipple entered into a second written agreement with Whisenant and Trenchard for the drilling of additional wells in the premises, and under this agreement eight producing wells were drilled and completed by July 6, 1939. On May 17, 1939, Lewis Production Co. entered into a separate agreement with Whisenant and Trenchard relative to the drilling of these wells. On March 27, 1940, Curran, *281 Ewald and Whipple entered into a third written agreement with Whisenant and Trenchard providing for the drilling of additional wells, and under this agreement, and a subsequent oral agreement with Lewis Production Co. on the same subject, nine producing wells were drilled and completed by July 12, 1940. Some time prior to or during January 1941, the pipe line company which was purchasing the oil, and which was responsible for making the payments to the proper persons, objected to the Power of Attorney then in effect, because the wives or husbands of the respective owners had not joined in it. To eliminate that objection, all of the owners heretofore listed, except Vera G. and H. G. Sandy, David B. White (who had disposed of his interest), Whisenant, Trenchard and the Lewis Production Co. executed, together with their respective wives or husbands, another power of attorney by which they appointed Curran, Ewald and Whipple as their attorneys for the following purposes: "* * * (1) to enter into any contract or contracts and to do all things requisite for the development, operation, and maintenance of said oil and gas lease; (2) to sell the oil and gas produced from said leasehold premises, *282 and to execute Division Orders or other instruments required by the purchaser of such oil and gas, and to collect and receive all money due the undersigned from the sale of said oil and gas produced from said leasehold premises, without the purchaser being required to look to the application and distribution thereof; (3) to pledge, assign, or transfer, in payment of obligations under any contract entered into for the development, operation, or maintenance of said lease, all or any part of our right, title and interest in and to seven-eighths (7/8) of the oil and gas as and when produced, saved, and sold from said leasehold premises; (4) to pay pro rata to the undersigned as his or her interest might appear, after the payment of all liabilities accrued by virtue of any contract, contracts, or obligations entered into for the development, operation, or maintenance of said lease, the surplus of the income derived from said leasehold premises; (5) to contract for and carry such insurance as is usually carried in the operation of oil and gas leases; giving and granting to their said attorneys full power and authority to do and perform all and every act and thing whatsoever required and *283 necessary to be done in and about said premises as fully, to all intents and purposes, as he or she might or could do if personally present at the doing thereof; hereby ratifying and confirming all that his or her said attorneys, or their substitute, may or shall lawfully do, or cause to be done, by virtue hereof, and we further ratify and confirm all contracts, Division Orders, and obligations heretofore made and entered into in connection with the development, operation, and maintenance of said leasehold premises." This instrument also revoked the power of attorney dated June 6, 1938. On February 26, 1941, Curran, Ewald and Whipple entered into a fourth written contract with Whisenant and Trenchard for the drilling of additional wells, and three producing wells were drilled, and completed by July 22, 1941. On February 26, 1941, Lewis Production Co. entered into a separate oral contract with Whisenant and Trenchard relating to the drilling of these wells. In all of these contracts with Whisenant and Trenchard, hereinabove referred to, petitioners were designated occasionally as "trustees" or "owners" or "attorneys in fact." On March 21, 1941, Vera G. Sandy and H. G. Sandy executed *284 and delivered to Curran, Ewald and Whipple an instrument revoking the Power of Attorney dated June 6, 1938, signed by them, and thereafter for the remainder of the period here in question they were each paid direct by the pipe line company purchasing the oil 1/112ths of the proceeds from the sale of the oil produced from the leased premises. Each of the petitioners is engaged in a fulltime business pursuit apart from his activity in connection with this oil lease. The operations under the lease were the exclusive responsibility, under the drilling contract, of Whisenant and Trenchard, who hired all the labor, furnished the necessary machinery and equipment, furnished the supplies, drilled the wells, gauged the oil, arranged for its sale to the pipe line companies, received the oil run tickets, made all repairs, and furnished petitioners with a statement each month showing their share of the expense of operating the producing wells, as distinct from any expense of developing new wells. The pipe line companies paid direct to petitioners that part of the proceeds from the sale of oil which was due to the interest represented by petitioners, and from that fund petitioners remitted to *285 Whisenant and Trenchard the amount of the operating expense shown to be due from such interest, and distributed the balance at reasonable intervals to the owners of the fractional interests. The division orders pursuant to which petitioners were paid by the pipe line companies certified that petitioners, who signed the orders, were trustees and the legal owners of wells on the Henry Lilly farm. Petitioners maintained no office for this enterprise, had no telephone or city directory listing, held no regular meetings, held title to no property and issued no certificates of beneficial interests. The only books or records kept by them were a large work sheet on which was listed the names of the interest holders whom they represented, showing their interests and the amounts distributed to them, a check book with stubs, and a cash book in which they entered the amounts received from the pipe line companies, the disbursements to Whisenant and Trenchard for operating expenses, and the distributions to the owners of fractional interests made by them. They kept no record of the cost of drilling, since they had nothing to do with that. No leasehold interests were ever assigned to them except *286 those fractional interests which they individually owned. They had no operating capital contributed by holders of the fractional interests. Petitioners had a bank account, in the name of "S. J. Ewald, Attorney in Fact" in which was deposited the money received from the pipe line companies, and upon which checks disbursing that money were drawn. The petitioners were not, during the taxable years, an association taxable as a corporation. Opinion KERN, Judge: We have for decision here the single question whether petitioners constitute an association taxable as a corporation. The Supreme Court, in Morrissey v. Commissioner, 296 U.S. 344, outlined the criteria to be applied in determining the taxability of associations. The Court there indicated that the existence of these factors furnish satisfactory evidence of the similarity of the association under consideration to a corporate organization: (1) Title in the association to the property embarked in the undertaking; (2) centralized management; (3) continuity of existence; (4) transferability of beneficial interests without affecting the continuity of the enterprise; and (5) limitation of personal liability *287 of participants to the property embarked in the undertaking. It was not there suggested that the existence of all these factors is necessary to a decision that the association is taxable as a corporation, but that the degree of its resemblance to a corporate form may be determined by the use of this yardstick. Of great, if not controlling, importance in this case is the fact that petitioners did not hold title at any time to any of the fractional interests in the lease except those interests owned by them severally as individuals. The legal title to all the interests represented by them remained with the various owners who signed the powers of attorney. It should be observed that petitioners never represented the owners of all the fractional interests, but only 78/112ths of the entire leasehold interest. Petitioners were not empowered by the instruments under which they acted to operate the business of producing oil which was expected to produce the income. They had power only to contract with others to do so, and to collect and distribute, in accordance with its terms, that share of the proceeds allocable to the owners represented by them. These powers they were to perform, not *288 as an entity, but as "in the name, place and stead" of the owners of the several interests. After petitioners entered into drilling contracts, it was necessary for the contractors to secure separate contracts from the owners of the remaining outstanding interests not owned by such contractors. Since petitioners held title to no assets, no certificates of beneficial interests were or could have been issued. In the event of the sale or assignment by an owner of his fractional interest, that interest automatically ceased to be represented by these petitioners, unless the new owner wished to execute a similar power of attorney. Even in the absence of such a transfer, an owner was free at all times to withdraw from the arrangement, and two owners did so revoke the power of attorney previously executed by them, and thereafter received their share of the proceeds direct from the pipe line companies. The drilling contracts contained a provision that all sums for which the owners were liable under those contracts, with specified exceptions, would be paid only from the oil runs, and that the liability of such owners is several only. As between the parties to those contracts, this may amount *289 to a contractual limitation of liability, but it does not amount to a general limitation of liability to the property embarked in the undertaking such as is provided by a corporate form of organization. This analysis of the powers and duties of petitioners under the instruments from which they derived their only powers is sufficient to show that they bore little resemblance to a corporate form. We think there was here no more than the relationship of principals and agents under the powers of attorney. See C. A. Everts, et al., 38 B.T.A. 1039, Horseshoe Lease Syndicate v. Commissioner, 110 Fed. (2d) 748, certiorari denied 61 Sup. Ct. 24; T. A. Johnston Trustee, Victory Lease, 38 B.T.A. 1199; Stantex Petroleum Co., 38 B.T.A. 269; Commissioner v. Rector & Davidson, 111 Fed. (2d) 332; Myers v. Commissioner, 89 Fed. (2d) 86. Decision will be entered for the petitioners.